WILLIAM T. HUNTER, JR. and CHRISTINE F. HUNTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; EDWARD M. WARONKER and BERYL G. WARONKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hunter v. Commissioner
Docket Nos. 8590-79, 8786-79.
United States Tax Court
T.C. Memo 1982-126; 1982 Tax Ct. Memo LEXIS 618; 43 T.C.M. (CCH) 764; T.C.M. (RIA) 82126; March 16, 1982. M.J. Mintz,Michael C. Durney,George T. Boggs,Peter H. Jost and Mary V. Harcar, for the petitioners. Steedly Young, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the income tax of William T. Hunter, Jr., and Christine F. Hunter for the calendar years 1973, 1974, 1975, and 1976 in the amounts of $ 16,305, $ 18,438, $ 5,912, and $ 7,023, respectively, and a deficiency in the income tax of Edward M. Waronker and Beryl G. Waronker for the calendar year 1975 in the amount of $ 3,197.78. The issues for decision are (1) whether the transaction between each of petitioners Edward M. Waronker and William T. Hunter and Southern Star Land and Cattle Co., Inc. *621 , was in substance a sale of 5 cows by the corporation to Mr. Waronker and a sale of 10 cows by the corporation to Mr. Hunter; (2) whether a nonrecourse note given by each Mr. Waronker and Mr. Hunter to Southern Star Land and Cattle Co., Inc., was a valid indebtedness; (3) whether the activity of each Mr. Waronker and Mr. Hunter with respect to the cattle which were the subject of their transactions with Southern Star Land and Cattle Co., Inc., was engaged in for profit; (4) whether Mr. Hunter's deductions in 1976 are limited by section 465 and, if so, to what extent; and (5) whether the minimum tax provided for in section 56 [1] is an excise tax, payments of which will entitle Mr. Hunter to a deduction under sections 162 or 212. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. William T. Hunter, Jr., and Christine F. Hunter, husband and wife, who resided in Talbot County, Maryland, at the time of the filing of their petition in this case, filed joint Federal income tax returns for the *622 calendar years 1973, 1974, 1975, and 1976 with the Internal Revenue Service Center, Philadelphia, Pennsylvania. Edward M. Waronker and Beryl G. Waronker, husband and wife, who resided in Dade County, Florida, at the time of the filing of their petition in this case, filed a joint Federal income tax return for the calendar year 1975 with the Internal Revenue Service Center, Chamblee, Georgia. In 1973 William T. Hunter, Jr. (Mr. Hunter) and Edward M. Waronker (Mr. Waronker) were each made aware of a cattle breeding program offered by Southern Star Land and Cattle Co., Inc. (Southern Star [2]). Southern Star was incorporated under the laws of the State of Florida in early 1970. The corporation was founded by Neal Levine, its president, and Harry Epstein, the chairman of its board. A confidential offering memorandum prepared by Southern star dated December 11, 1974, states that "The Company is principally engaged in the business of breeding and raising cattle and in the sale and maintenance of such cattle under an Agreement with the purchasers of [breeding herds] * * *." *623 Mr. Levine, who was 30 years old in 1970, was a practicing CPA in the Miami area when he organized Southern Star. During the years here in issue, Southern Star had three main ranches. One was located in Citra, Florida, another in Cassoday, Kansas, and the third in Marshfield, Missouri. Mr. Hunter became aware of the program offered by Southern Star through his brother-in-law, Russell Fisher. Mr. Fisher and Mr. Hunter had participated jointly in various business ventures on a number of occasions prior to Mr. Fisher bringing the Southern Star program to Mr. Hunter's attention. Mr. Hunter became a participant in the Southern Star program in 1973 on the advice and recommendation of Mr. Fisher. During the years in issue, Mr. Hunter was the vice president and general counsel of the Jasper Corporation of Bethesda, Maryland. On his income tax returns for these years, he listed his occupation as that of executive. In 1968 Mr. Hunter received a J.D. degree from the University of California, Hastings College of the Law. In 1969 he received an LL.M. degree in taxation from the New York University School of Law. From 1969 to 1973, he was employed as a trial attorney in the Refund *624 Litigation Section of the Tax Division of the United States Department of Justice. Mr. Waronker is a real estate appraiser by profession and operates his own apprisal company. In 1952 Mr. Waronker received a bachelor's degree from Temple University, Philadelphia, Pennsylvania, with a major in accounting, and in 1958 he received a master's degree in finance from the University of Miami. An insurance and pension plan consultant brought the Southern Star program to Mr. Waronker's attention. After talking to a fellow appraiser who had decided to take part in the program, Mr. Waronker has his own personal accountant look into the Southern Star operation. After receiving his accountant's advice, Mr. Waronker became a participant. On November 7, 1973, Mr. Hunter entered into an agreement with Southern Star which provided in part that Mr. Hunter (Buyer) "hereby purchases and Seller * * * [Southern Star] hereby sells a unit of breeding cattle consisting of ten (10) Purebred Aberdeen Angus females, * * * (hereinafter referred to as the 'Basic Herd') * * *." The agreement stated that the buyer agrees to pay a total purchase price of $ 72,000 for the "Basic Herd" consisting of a $ *625 6,000 downpayment and a $ 66,000 nonrecourse note secured by the cattle with an interest rate of 6 percent. On May 3, 1973, Mr. Waronker entered into a similar agreement with Southern Star except his agreement provided for the purchase of a "Basic Herd" of 5 exotic bred cows [3] for $ 36,000 and with a $ 1,000 downpayment and a $ 35,000 nonrecourse note secured by the cattle with an interest rate of 6 percent. The following terms of payment on the two "notes" were identical (except as noted): (1) Interest on the entire unpaid principal balance of the note computed at the rate of 6 percent per annum was to be paid quarterly through December 1, 1975 (interest owed by Mr. Waronker to be paid semi-annually through December 1, 1975); (2) An amount equal to 30 percent of the total net proceeds resulting from the sale of animals in the herd (gross sales price less commissions, sales costs, and brokerage fees) from time to time as such animals were *626 sold was to be applied to reduction of principal until the principal balance on the note was paid in full. (3) Interest at the rate of 6 percent per annum upon the unpaid balance of the note accruing after December 1, 1975, was to be paid from 20 percent (referred to as the buyer's share of the proceeds) of the net proceeds realized from the sales of animals in the herd subsequent to December 1, 1975. In the event such proceeds were insufficient to pay accumulated interest, any deficiency was to be carried forward and charged against the buyer's share of the proceeds realized from future sales. The sales contract with Mr. Hunter further provided with respect to the purchase price of the cattle as follows: XI. Buyer agrees to release Seller of all obligations under the Sales and Management Agreements including those obligations listed herein, in the event Buyer desires to remove his Herd from Seller's care and maintenance. Seller agrees that upon written notice of the Buyer to remove his Herd from Seller's care and maintenance, and full payment of the Note due Seller, that Seller will arrange within thirty (30) days for the Herd to be prepared for shipment and delivery. Buyer *627 will pay all costs of preparation and shipment. Seller agrees to reduce the purchase price of the Basic Herd in the following manner: 1. If Buyer takes delivery of the Herd in 1973, the Note will be reduced by fifty four thousand ($ 54,000.00) dollars. 2. If Buyer takes delivery of the Herd in 1974, the Note will be reduced by thirty six thousand ($ 36,000.00) dollars. 3. If Buyer takes delivery of the Herd in 1975, the Note will be reduced by eighteen thousand ($ 18,000.00) dollars. All obligations under the Management Agreement will be prorated through the date of removal, and will be paid by the Buyer before the removal of the Herd. In the event the Buyer wishes to remove the Herd after January 1, 1976, then Buyer must complete payment of the Note and its obligations under the Management Agreement. When Buyer takes delivery of the Herd he will pay to Seller Fifty (50%) percent of the Herd value. Herd value will be the value of the Herd under normal marketing procedures. Herd value will satisfy Section 8, Part D of the Management Agreement. Mr. Waronker's contract had an identical provision except the amounts of reductions were in proportion to his $ 36,000 stated *628 sales price. The sales agreements contained the guarantee that the animals purchased are warranted to be breeders. [4] Both also provided (if the management contracts were in force) that if any animal in the "basic herd" ceased to be a breeder, Southern Star was obligated to replace that animal with another of equal quality and age. Under the management contract which Mr. Hunter entered into simultaneously with his sales agreement, Southern Star agreed to breed, care for and maintain his herd of animals. However, the term "herd" as used in the management contract included not only the purchased animals but all substitutes, together with any heifers and cows which were born to and retained in the herd which had reached the age of 24 months. Under the management contract, beginning with the 1974 calf crop, Southern Star would retain from each year's calf crop sufficient heifer calves to be added to Mr. Hunter's herd, so that by December 31, 1979, his breeding herd would consist of at least 16 animals and the breeding herd was to be maintained at *629 that level for the duration of the contract. The management contract provided as follows with respect to Southern Star's discretion in managing the cattle: 14. Subject to the express provisions contained herein, and so long as this Agreement is in effect and the NOTE (as defined in the Sales Agreement) or any part thereof remains unpaid, * * * [Southern Star] or any subsequent holder of the Note shall have full control of the location, maintenance, expansion, breeding and culling of the Herd which constitutes the collateral security for such Note, including, without limitation, the matters described in Section 7 above and the determination of the most opportune time for sales from the Herd. Upon any default by * * * [Southern Star] pursuant to the provisions of section 17 below and the termination of this Agreement pursuant thereto, or upon payment of the Note in full, Owner shall have the right to enter into any management agreement with respect to the Herd which Owner, in his sole judgment or discretion, may decide. Paragraph 7 of the management agreement stated that Southern Star would "give freely of its advice and counsel relative to the maintenance, expansion and breeding *630 of the Herd," and paragraph 17 provided for termination of the agreement if Southern Star was declared a bankrupt. Paragraph 9C of the management agreement provided as follows: C. All sales of animals made by * * * [Southern Star] for which full payment is to be received in less than fifteen (15) months shall not require the consent of the Owner. However, on any sales of animals by * * * [Southern Star] with an extension of credit of fifteen (15) months or more, * * * [Southern Star] shall obtain the consent of Owner, which consent shall not be unreasonably withheld. Under the management contract, Southern Star guaranteed that beginning May 1, 1974, the breeding herd should have an annual live calf birth rate of at least 80 percent and, if there was any shortfall, Southern Star would transfer to Mr. Hunter a sufficient number of animals of comparable value and quality to make up the deficiency. The animals transferred to make up the deficiency were to consist of approximately half heifer calves and half bull calves. Under the agreement Southern star also guaranteed to replace any animal in the breeding herd dying before its tenth birthday. Any such replacement was *631 to be similar in age, sex and value to the deceased animal and was itself to be in good and sound condition. [5]
The management agreement provided that Mr. Hunter would pay Southern Star the following management fee for the maintenance of his herd and for pasture rental: A. In 1973, $ 10,000 on December 5, 1973; B. In 1974, $ 10,000 to be paid in four installments of $ 2,500 each by January 1, 1974, April 1, 1974, July 1, 1974, and October 1, 1974; C. In 1975, $ 6,000 to be paid in four installments of $ 1,500 each by January 1, 1975, April 1, 1975, July 1, 1975, and October 1, 1975, and D. Additionally, 50 percent of all net proceeds (gross sales price less commissions, sales costs and brokerage fees) from the sale of cattle in the herd. The management agreement provided that Southern Star would deliver to Mr. Hunter yearly reports detailing the ear tag number, tattoo number and location of each of his animals and would maintain books and records covering the registration certificates on all animals owned by Mr. Hunter, of all sales of animals in his herd, of all *632 deaths of animals in his herd, of substitutions and replacements made to the herd and all other records concerning breeding. The agreement provided that these books and records were to be open to Mr. Hunter's inspection during normal business hours upon his giving at least 15 days' notice to Southern Star. The management agreement provided that Mr. Hunter would apply for a lifetime membership in the American Angus Association and would pay for all registration and transfer fees on cows registered in his name. However, the sales agreement provided that "The herd will remain registered under the name of * * * [Southern Star] or its nominee for benefit of Owner with the American Angus Association." The management agreement provided that either party should have the option to liquidate the herd when the principal owed on the purchase note was $ 30,000 or less. However, Southern Star had the option to liquidate at any time so long as it gave written assurance that the net liquidation proceeds would be equal to at least three times the remaining balance owed on the principal of the purchase note. The management contract was to terminate upon liquidation of the herd, but Southern *633 Star had the option to terminate it at any time after the purchase note was fully paid or if there was a failure by the puchaser to cure any default in payment. The management contract which Mr. Waronker entered into with Southern Star simultaneously with the signing of his sales agreement had substantially the same terms as Mr. Hunter's management contract except as to number of cattle, amounts of payments, payment dates and references to exotic cattle rather than Black Angus. In Mr. Waronker's management contract, his breeding herd was to consist of at least eight animals by December 31, 1979. The management fees provided for under Mr. Waronker's contract for care and maintenance and pasture rental were: A. In 1973, $ 5,000 on October 19, 1973; B. In 1974, $ 5,000 to be paid in semi-annual installments of $ 2,500 each on June 1, 1974, and December 1, 1974; C. In 1975, $ 3,000 to be paid in semi-annual installments of $ 1,500 each on June 1, 1975, and December 1, 1975; and D. Additionally, 50 percent of all net proceeds (gross sales price less commissions, sales costs and brokerage fees) from sale of animals. Mr. Waronker's management agreement required him to apply *634 for life membership in various exotic cattle associations as well as pay all registration and transfer fees on cows registered in his name. However, Mr. Waronker's sales agreement contained the same provisions as Mr. Hunter's with respect to cattle being registered in the name of Southern Star. Under the management agreement between Mr. Waronker and Southern Star, either party had the option to cause liquidation of the breeding herd when the balance on the $ 35,000 nonrecourse note had been reduced to $ 15,000 or less. [6]
*635 The December 11, 1974, offering memorandum of Southern Star contained the following statements with regard to suitability standards for an investor: [7]
*636 SUITABILITY STANDARDS
The Company offers this investment only to those persons who are able to meet certain suitability standards and are able to assume the risks attendant to an investment of this nature. Accordingly, this investment is offered only to those people whom the Company believes satisfy the following requirements: 1. Persons with a net worth (excluding home, furnishings, and automobiles) of at least $ 150,000 and who, without regard to this investment, have some portion of their annual income subject to Federal Income Tax in at least the 50% tax bracket during the current tax year. Neither Mr. Hunter nor Mr. Waronker visited the Southern Star ranches to inspect or examine the cows he agreed to buy under his sales contract. Southern Star selected the cows to be assigned to each petitioner, and it did so by simply going down a list of available cows and assigning animals, in order on that list, to satisfy the number of cows called for by a sales contract. Under his sales contract and management contract, neither Mr. Hunter nor Mr. Waronker had the right to pick the cattle he was agreeing to buy but took the cattle assigned to him by Southern Star. Prior *637 to entering into the agreements with Southern Star, neither Mr. Hunter nor Mr. Waronker had engaged in cattle breeding. In the purebred cattle breeding business, the maintenance of careful records on each cow is very important. Southern Star sent out semi-annual herd reports to the participants in its breeding program. Southern Star also provided tax froms, with pertinent tax data, to each Mr. Hunter and Mr. Waronker who each reflected yearly transactions with respect to his breeding cattle on his Federal income tax returns in the exact manner as provided by Southern Star. Mr. Hunter and Mr. Waronker each received the following letter from Southern Star during the fourth and fifth years of his involvement in the breeding program: [Date] Dear Herdowner: You are now in either your fourth or fifth year of cattle breeding with Southern Star and, as you know, Uncle Sam requires that you show a profit during two out of five years to meet the requirements of the Hobby Loss rule. We are now preparing to sell animals so that this profit requirement can be met. We, at Southern Star, take great pride in the herd we have been developing in the past few years. We have culled *638 the herd systematically and along with selective purchases of breeding animals and the latest in breeding techniques we have developed a fine breeding herd. In line with our breeding program there are specific animals in your herd which we do not wish to sell to other breeders. We would like to retain them in our own breeding herd. We have evaluated these animals and have determined their estimated value to us. We have enclosed a list of these animals and their estimated prices. Southern Star requests to purchase these animals from you and agrees to waive its Management and Interest proceeds received from such sales and will apply the entire proceeds of this sale to reduce your mortgage. We have analyzed your herd and depreciation method used. We may recommend that you switch from the declining balance method of depreciation to a straight line method. This switch of depreciation method was taken into consideration when we analyzed your Program. As always, when we prepare your information forms for [year], we will make the conversions where we feel it is appropriate. We recommend that you review this with your adviser when you receive our forms. If any of the animals *639 Southern Star requests to purchase include any Basic Herd animals, we have shown a tax analysis of the transaction. If you agree to the above, please sign the enclosed list and return immediately. If you have any questions, please contact me. Sincerely, SOUTHERN STAR LAND & CATTLE CO., INC.
/s/ M. F. Haskell, Comptroller It was Southern Star's practice to send out such letters to participants who were in their fourth and fifth years of the breeding program. Attached to the letter sent to each Mr. Hunter and Mr. Waronker was a listing of particular cows which Southern Star offered to buy from him for a stated price. The December 1, 1976, letter sent by Southern Star to Mr. Hunter had the following attached page: William T. Hunter December 1, 1976 I agree to sell the following animals to Southern Star Land & Cattle Co., Inc. I understand that Southern Star has waived its Management and Interest rights and will apply all the proceeds to reduce my mortgage. Ear Tag
Date of
Number
Birth
Amount
9667
9/15/74
3,100.00
9662
9/18/74
3,100.00
Date: An identical letter dated May 7, 1976, was sent to Waronker by Southern *640 Star, offering to buy his cow with the ear tag number 9827 for $ 6,200. Mr. Waronker agreed to the proposed purchase of the cow by Southern Star. Mr. Hunter had not replied to his letter from Southern Star by December 29, 1976. Under date of December 29, 1976, Southern Star wrote a letter to Mr. Hunter, the boyd of which reads as follows: As of this date we have not received a reply from you approving our request of December 1, 1976 to purchase specified animals from your herd. If we do not hear from you within ten days, we will assume that you accept our offer to purchase these animals. Under date of January 6, 1977, Mr. Hunter wrote a letter to Southern Star, the body of which is as follows: This is in response to your letter of December 29, which reached this office with this morning's mail. I do not consent to the purchase by * * * [Southern Star], or any related entity or individual, of any of the stock contained in my breeding herd. Without intending to impune the character of your organization, or its employees, I find the conflict of interest inherent in your proposal to be so glaring as to be almost beyond comprehension. I have paid and am paying to your *641 organization a sizeable sum to provide care and management for my breeding herd. I have engaged your services to that end due to my ignorance of the cattle breeding business. My ignorance extends to a lack of knowledge as to the fair market value of individual members of my herd. It would be foolhardy for me to agree to sell my breeding stock to you without benefit of an independent expert valuation, and in my opinion your suggestion that I entertain such an agreement constitutes an act of mismanagement on your part. Surely you must see that in instances where sales of my cattle are made at arm's length with third parties, a right you have retained under the management contract, our interests in the outcome of the sale are coincident, and thus my interests are protected. If * * * [Southern Star] or any related individual or entity wishes to buy any of my cattle, an independent expert appraisal will be a necessary precondition. When Mr. Hunter received his status report in 1977, he learned that the two cows (referred to in the letter to him from Southern Star dated December 1, 1976) were not part of his herd because the two animals had been purchased by Southern Star in December *642 1976. Mr. Hunter reviewed his agreements with Southern Star and concluded that under these agreements Southern Star had the right to purchase his cattle without his consent. [8] Southern Star sent out a tax form to each Mr. hunter and Mr. Waronker which reflected the sale transaction between each of them and Southern star. Mr. Hunter and Mr. Waronker, each on his own income tax return for the year 1976, incorporated the exact data which had been furnished to him by Southern Star.The herd status reports sent respectively to Mr. Hunter and Mr. Waronker showed that the animals referred to in the respective letters from Southern Star had been purchased from his herd. The cow records maintained by Southern Star on the mothers of cows numbers 9667 and 9662 (the animals stated to have been purchased by Southern Star from Mr. Hunter's herd) showed that both 9667 and 9662 had been inadvertently sired by the *643 bull of a neighbor of Southern Star. These records showed that at birth both numbers 9667 and 9662 were red, white-faced calves. The cow records for numbers 9667 and 9662 disclose that the animals were resold on March 18, 1977, by Southern Star to a third party for $ 175.64 each. Cow number 9827, which was the cow referred to in the letter from Southern Star to Mr. Waronker, was a half Simmental and half Charolais. The cow records maintained by Southern Star state on their face that the mother of number 9827 was an unregistered Charolais. An animal which is not registered, as well as any offspring produced by it, is worthless for purebred breeding purposes. The individual cow record maintained by Southern Star on number 9827 states that on March 18, 1977, the animal was sold by Southern Star to a third party for $ 252.31. On the income tax returns filed by Mr. Waronker for 1976 and 1977, he reported a slight profit for each year on the cattle breeding operation with Southern Star. Mr. Hunter reported a small profit in 1976 and apparently also in 1977. Mr. Hunter and Mr. Waronker each in his petition alleged that he was entitled to the presumption provided under section 183(d). *644 The following two tables summarize the income reported and the deductions and credits claimed by each Mr. Hunter and Mr. Waronker for the years indicated from his participation in the Southern Star program: Table A -- Mr. Hunter
1973
1974
1975
1976
1977
Total
Income
$ 29
$ 95
$ 8,126
* $ 11,144
$ 19,394
Additional
first-year
depreciation
allowance
(sec. 1979)
$ 4,000
Other
depreciation
9,714
16,653
11,895
5,948
5,948
Interest
1,036
3,960
3,960
273
989
Maintenance
and pasture
rental
10,000
10,015
6,047
683
2,472
Subtotal of
deductions
claimed per
year
$ 24,750
$ 30,628
$ 21,902
$ 6,904
$ 9,409
$ 93,593
Investment
credit
$ 5,040
$ 5,040
Table B -- Mr. Waronker
1973
1974
1975
1976
Income
$ 47
$ 241
$ 6,437
Additional first-year
depreciation allowance
(sec. 179)
$ 4,000
Other depreciation
9,143
$ 6,531
$ 4,665
$ 3,332
Interest
1,420
1,050
2,100
1,097
Maintenance and pasture
rental
5,710
2,523
4,121
1,619
Subtotal of deductions
claimed per year
$ 20,273
$ 10,104
$ 10,886
$ 6,048
Investment credit
$ 2,520
*645 1977
1978
Total
Income
$ 630
$ 828.56
$ 8,183.56
Additional first-year
depreciation allowance
(sec. 179)
Other depreciation
$ 5,142.86
Interest
$ 126
165.71
Maintenance and pasture
rental
315
414.48
Subtotal of deductions
claimed per year
$ 441
$ 5,723.05
$ 53,475.05
Investment credit
$ 2,520.00
Mr. Hunter, on his original 1973 Federal income tax return, reported income from salaries and wages of $ 28,333, income from dividends after the dividend exclusion of $ 118,505, and interest income of $ 5,847. He, however, reported a loss in adjusted gross income (prior to claimed deductions) of $ 195,035, composed of a distributive share of partnership losses of $ 322,810 and the farm income loss of $ 24,750 arising from the transaction here in issue, less a director's fee of $ 125. Subsequently, as will be hereinafter more fully discussed, in December 1975 Mr. Hunter filed an amended Federal income tax return for the year 1973 reporting a corrected adjusted gross income of $ 307,038 rather than the $ 195,035 loss previously reported. On his 1974 Federal income tax return Mr. Hunter reported $ 37,000 of salary income, *646 $ 118,192 of dividend income after subtraction of the dividend exclusion, $ 4,418 of interest income, and a loss of $ 106,973, leaving adjusted gross income of $ 52,637, which, when reduced by claimed itemized deductions and dependency exemptions, left taxable income of a loss of $ 369. The $ 106,973 loss was composed of the following items: Net gain or (loss) from Supplemental
Schedule of Gains and Losses
(attach form 4797)
[9] $ 29 Pensions, annuities, rents, royalties,
partnerships, estates or trusts,
etc. (attach Schedule E)
(12,282)
Farm income or (loss) (attach
Schedule F)
[10] (30,628)
State income tax refunds
3,000 Other - Director's Fee
375 Net operating loss carryover - Schedule
attached
(67,467)
[A schedule attached to Mr. Hunter's original 1974 return showed a net operating loss carryover computed as follows: Net operating loss 1973
$ (255,796) Carryback to 1970, 1971,
and 1972
[11] (188,329) Carryover to 1974
$ ( 67,467)]
*647 In December 1975, at the same time Mr. Hunter filed an amended 1973 income tax return he filed an amended 1974 income tax return, the major adjustment in the amended 1974 return being an elimination of the claimed net operating loss carryover deduction of $ 67,467 claimed on his original return. The other adjustment consisted of an additional capital gain which is not of consequence in this case. The amended 1973 return showed that the change in income from that reported on the original returns was a previously unreported net gain from sale of capital assets of $ 502,073. On Schedule D, attached to the amended return, the capital gain was reported as follows: Short-term capital gain per
original return
$ 1,648 Long-term capital losses per
original return
(173,325)
Condemnation gain (see attached
statement)
1,174,175 Net long-term capital gain
1,000,850 Net gain
1,002,498 50 percent of long-term capital
gain
500,425 Total capital gain
502,073 The explanation given in the 1973 amended return *648 for the change was as follows: CONDEMNATION GAIN
In 1973 the Fisher Family Partnership received condemnation proceeds which resulted in a gain. Pursuant to section 1033(a)(3) and regulation 1.1033(a)-2(c)(2), the gain was not recognized in 1973 by the partnership.Since the replacement period ends on 12/31/75 and qualifying replacement has not been made, the taxpayers are including their respective share of the gain in income. The 1973 return of the Fisher Family Partnership has also been amended. * * * In 1975, Mr. Hunter reported salary income of $ 42,000, dividend income after the dividend exclusion of $ 94,908, interest income of $ 5,632, and income other than wages, dividends and interest of $ 60,319, resulting in total adjusted gross income of $ 202,859. The $ 60,319 of other income was composed of net gain from the sale or exchange of capital assets of $ 255,914, partnership losses of $ 169,217, farm income loss of $ 21,807 which was the loss claimed from the transaction here in issue, and other loss of $ 4,571 which related to items not here pertinent. In 1976, Mr. Hunter reported salary income of $ 151,000, dividend income after dividend exclusion of $ 75,837, *649 interest income of $ 46,167, and a loss from other than wages, dividends and interest of $ 127,930. Included in computing this loss was a loss of $ 6,904, denominated farm income or loss which related to the transaction here in issue. For the year 1977, Mr. Hunter on his Federal income tax return reported income from salary of $ 62,000, interest income of $ 68,848, dividend income after the exclusion of $ 165,722, capital gain of $ 31,400, net gain from the supplemental schedule of gains and losses (Form 4797) of $ 11,144, losses from partnerships of $ 96,239, farm income loss of $ 89,713, resulting in total adjusted gross income of $ 153,156. On the Form 4797, Mr. Hunter reported ordinary gain of $ 11,144 from breeding cattle. [12] The loss reported under the designation farm income or loss was derived from two Schedule F's attached to Mr. Hunter's 1977 return. The first of these schedules showed a loss from an operation designated Cook's Hope Farm. The second Schedule F showing a loss from an operation designated "Breeding Cows--Florida" of $ 9,409 was from the transaction involved in the instant case. *650 Mr. Waronker, on his 1973 return, reported income from salary of $ 51,044.50 and interest income of $ 539.76 which he reduced by a loss of $ 13,394.76. This loss was composed of a $ 20,273 claimed loss from the transaction here involved reduced by certain rental income and capital gains and a small amount of earnings of his wife as a travel agent. On his 1974 return Mr. Waronker reported $ 51,712.11 of salary income and $ 906.42 of interest income and a loss of $ 26,475.28 from other items. Included in this loss of $ 26,475.28 was a loss of $ 10,104 reported on the transaction here in issue. On his 1975 tax return Mr. Waronker reported salary income of $ 39,898.17 and interest income of $ 1,114.70, reduced by a loss of $ 12,832.33, which included a $ 10,886 loss from the transaction here in issue. On his 1976 return Mr. Waronker reported $ 40,250.93 of salary income, $ 761.48 of interest income, reduced by a loss of $ 9,966.18 which included a $ 6,048 loss from the transaction here in issue. On his 1977 return Mr. Waronker reported $ 41,481.79 of salary income, $ 1,114.45 of interest income, $ 630 of capital gains, and $ 9,532 of income from pensions, annuities, rents, *651 royalties, partnerships, etc., reduced by a farm income loss of $ 441. The $ 441 farm income loss was from the transaction here in issue. On the Schedule F attached to his 1977 return Mr. Waronker claimed no depreciation deduction from the transaction here in issue. Mr. Waronker, on his 1978 return, reported salary income of $ 29,457.91, interest income of $ 7,403.22, capital gains of $ 20,640.89, sale of breeder cattle culls of $ 828.56, a farm income loss from the transaction here in issue of $ 5,722.85, and a loss from pensions, annuities, rents, royalties, partnerships, etc. of $ 14,500. The Schedule F attached to Mr. Waronker's 1978 return showed the claimed $ 5,722.85 farm loss to consist of interest of $ 165.71, management and pasture rental of $ 414.28, and depreciation of $ 5,142.86. Southern Star on its Federal income tax return for its fiscal year ended November 30, 1973, attached a schedule denominated "Installment Sales." This schedule showed in part as follows: YEAR ENDED - NOV. 30: 1970 (55,088 X 97.51%)
53,716
1971 (134,843 X 87.52%)
118,014
1972 (52,185 X 91.02%)
47,499
1973 (67,000 X 93.37%)
62,752
281,981
TAXPAYER *652 HAS ELECTED TO REPORT SALES OF CATTLE UNDER SEC. 453 I.R.C. -- INSTALLMENT METHOD. Southern Star on its Federal income tax return for its fiscal year ended November 30, 1974, attached a schedule denominated "Installment Sales." This schedule showed in part as follows: DESCRIPTION OF PROP. SOLD BREEDING PROGRAMS DATE ACQUIRED: VARIOUS DATE SOLD: 1974 1. GROSS SALES PRICE
$ 1,898,400 2. ORIGINAL COST
$ 130,833
3. PLUS: CAPITAL IMPROVEMENTS
4. PLUS: EXPENSES OF SALE
5. TOTAL COST
$ 130,833
6. LESS: ALLOWED OR ALLOWABLE DEPRECIATION
7. ADJUSTED COST
130,833 8. NET PROFIT ON SALE
$ 1,767,567 9. PERCENT OF NET PROFIT TO GROSS SALES PRICE CURRENT YEAR REPORTABLE PROFIT
93.108249%
10. DOWN PAYMENT RECEIVED (IF SOLD THIS YEAR)
$ 43,724
11. OTHER PAYMENTS RECEIVED THIS YEAR
12. TOTAL PAYMENTS RECEIVED THIS YEAR
$ 43,724
13. PROFIT REPORTABLE THIS YEAR (ITEM 12 X ITEM 9)
40,711 A comparable schedule was contained in Southern Star's Federal income tax return for its fiscal year ended November 30, 1975, which showed in part as follows: Computation of Installment Income - 1975
Property Sold -- CATTLE BREEDING PROGRAMS
Gross Sales Price
2,768,000 Cost of Sales
152,545 Gross Profit on Sales
2,615,455 Percent of Gross Profit to Gross Sales Price
94.48898%
Collections Received in Current Year
74,250 Profit Reportable This Year (Line 28 X 31)
70,159 *653 Of the ten cows assigned by Southern Star to Mr. Hunter in the attachment to his sales agreement, four had been purchased by Southern Star for $ 345 each, one had been purchased by Southern Star for $ 800, one had been purchased by Southern Star for $ 1,000, and four had been born on the Southern Star Ranch. The five cows assigned to Mr. Waronker by Southern Star in the attachment to his sales contract had been purchased by Southern Star for $ 230 each. As of December 31, 1979, and as of the date of the trial in December 1980, the records of Southern Star showed only ten cows in Mr. Hunter's herd and five cows and one calf in Mr. Waronker's herd. Respondent in his statutory notice of deficiency to Mr. Hunter disallowed all the deductions and the investment credit claimed by Mr. Hunter for the years 1973 through 1976 as a result of his participation in the Southern Star program, except the $ 1,036 interest deduction claimed in 1973. Respondent in his answer to the petition, however, asserts that the statutory notice erroneously had failed to disallow the $ 1,036 interest deduction claimed by Mr. Hunter and claimed an increased deficiency. Respondent in his statutory notice *654 of deficiency to Mr. Waronker disallowed all the deductions claimed by him for the year 1975 as a result of his participation in the Southern Star program. Mr. Hunter in his petition alleged the following with respect to the $ 37,000 and $ 16,601 of minimum tax paid by him for the years 1973 and 1975, respectively: (kk) The minimum tax is a Federal excise tax which is deductible under Section 162 as an ordinary and necessary business expense or under Section 212 as an expense incurred for the production of income. In determining Petitioners' tax liability for 1975 and 1976, Respondent fauled to allow as a deduction the amounts of $ 37,000.00 and $ 16,601.00, respectively, in minimum taxes paid by Petitioners during such years. Mr. Hunter paid the $ 37,000 of minimum tax for 1973 in 1975. He paid the $ 16,601 of minimum tax for 1975 in 1976. Mr. Hunter alleges in his petition that he is entitled to income tax deductions in 1975 and 1976 for these respective amounts paid as minimum tax. OPINION Respondent's primary contention in this case is that the respective transactions between Mr. Hunter and Mr. Waronker and Southern Star do not have sufficient economic substance *655 to constitute sales of cattle by Southern Star to Mr. Hunter and Mr. Waronker. It is respondent's position that despite the words contained in the various documents executed by the parties, the transaction did not in fact transfer the benefits and burdens of ownership of the cattle to Mr. Hunter and Mr. Waronker. Respondent contends that since the transactions lack economic substance, Mr. Hunter and Mr. Waronker are not entitled to the depreciation and interest deductions and investment tax credit, provided under various provisions in the Internal Revenue Code, which they have claimed for the years in issue. It is well settled that the mere signing of papers calling a transaction by a certain designation does not cause the transaction to acquire that status for Federal income tax purposes. Likewise, signing papers which on their face formally comply with the requirements of a tax statute does not give substance to a transaction when in fact it has no economic substance.As stated in Gregory v. Helvering,293 U.S. 465, 469 (1935), "But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." See *656 also Knetsch v. United States,364 U.S. 361, 364-365 (1960). Whether a transaction denominated in documents signed by a taxpayer as a sale constitutes a sale for tax purposes is a question to be determined from the entire provisions of the documents, as well as all the other evidence of record. Generally, a sale is a transfer of property for money, or a promise to pay money. Commissioner v. Brown,380 U.S. 563, 570-571 (1965). In order for such a transfer to occur, the purchaser must acquire the burdens and benefits of ownership of the property. Numerous factors are to be considered in determining whether what purports by words in documents to be a sale is in economic substance a sale. Where the "promise to pay" is a non-recourse note, as here, it must be determined if the note itself has economic substance. Other factors to be determined are (1) whether the stated price for the property is within a reasonable range of its value; (2) whether the purported purchaser has any control over the property and, if so, to what extent; (3) whether there is any intent that the stated purchase price of the property will ever be paid; and (4) whether the *657 purchaser will receive any benefit from the disposition of the property. The determination of whether a purported sale is in economic substance a sale for purposes of Federal income tax must be made as of the date of the purported sale. However, subsequent actions of the parties may be considered to the extent those actions cast light on the intention as it existed at the time of the purported sale. In deciding the extent to which a nonrecourse note has economic substance, a number of cases have relied heavily on whether the fair market value of the property acquired with the note was within a reasonable range of its stated purchase price. Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Hager v. Commissioner,76 T.C. 759 (1981). Compare Frank Lyon Co. v. United States,435 U.S. 561 (1978), where among other things the buyer-lessor in a sale-leaseback transaction was personally liable on the mortgage. See also on this point *658 Hilton v. Commissioner,74 T.C. 305, 363 (1980). As stated by the Ninth Circuit Court of Appeals in Estate of Franklin,supra at 1048: An acquisition * * * if at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. This is the stuff of substance. It meshes with the form of the transaction and constitutes a sale. No such meshing occurs when the purchase price exceeds a demonstrably reasonable estimate of the fair market value. Payments on the principal of the purchase price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value. Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase. * * * The stated price under the sales agreement entered into by each Mr. Hunter and Mr. Waronker with Southern Star was $ 7,200 per cow. At trial, each Mr. Waronker and Mr. Hunter testified that he knew that, viewed in isolation, *659 such amount greatly exceeded the animals' actual value. Mr. Hunter, who in 1973 considered himself to be an informed layman on the subject, testified that at the time he considered that a good quality breeding cow would sell at auction for a price of between $ 800 to $ 1,200. Mr. Waronker, while stressing that he was not expert in the matter, testified that in 1973 he had the general idea that a good breeding cow would sell at auction for somewhere between $ 500 to $ 1,000. The evidence in this record shows that even these estimates of Mr. Hunter and Mr. Waronker were high. Mr. Hunter and Mr. Waronker each attempted to justify the $ 7,200 price per cow by stating that he believed he was really purchasing an entire breeding program. Clearly a price of $ 7,200 per cow for the animals which Southern Star assigned to Mr. Hunter and Mr. Waronker is many times the animals' actual fair market value. The evidence shows that of the ten animals assigned by Southern Star to Mr. Hunter, four had previously been purchased by Southern Star for $ 345 each, another two animals had been purchased by Southern Star for $ 800 and $ 1,000, respectively, and the last four animals had been born on *660 the Southern Star ranch. All five of the animals assigned to Mr. Waronker had previously been acquired by Southern Star for $ 230 apiece. Neal Levine, Southern Star's chief executive officer, testified that had either Mr. Hunter or Mr. Waronker not wanted to enter into the management contract and merely wished to buy cows from Southern Star, he could have done so for a cash price of $ 1,800 per cow. [13] The record of sales actually made by Southern Star of cattle indicates that even this greatly reduced cash price was approximately three times the average amount being received by Southern Star when it made cash sales of cows. Based on the record in this case, the conclusion that the stated sales prices of $ 7,200 per cow was many times the animals' actual value is inescapable. Petitioners, however, strenuosly argue that the stated price of $ 7,200 per cow represents the fair market value of the animals purchased in the sense that it is the price petitioners had to pay to be involved in a long-term *661 breeding program operated by their agent, Southern Star. Upon consideration of all the evidence of record, including the testimony of Mr. Hunter and Mr. Waronker, we do not agree with petitioners' position. Mr. Levine, the promoter of this program, testified that the portion of the $ 7,200 per cow which exceeded $ 1,800 was due to the special, unique guarantees Southern Star was offering. [14] The guarantees Mr. Levine referred to are the guaranteed 80 percent live calf birth rate and Southern Star's obligation to replace any animal which turns out to be a non-breeder or which dies prior to its tenth birthday. [15] Mr. Levine testified that these guarantees would not be given if the buyer did not enter the management agreement. An expert witness called by petitioners testified that in his opinion the price of $ 7,200 per cow was reasonable when the provisions of the sales contract and management contract were considered together as a package. [16] This witness gave no basis for his stated opinion, and in light of all the evidence in this record we do not accept his conclusion. *662 Petitioners argue strenuously that the 1973 transactions were sales at arm's length between independent, unrelated parties. Thus, they argue that the fact that petitioners were willing to buy and Southern Star was willing to sell at a price of $ 7,200 per cow is strong, if not conclusive, evidence of fair market value. Such is not the case. Petitioners and Southern Star have an obvious common interest in inflating the stated purchase prices. [17] By doing so they would generate basis so as to allow petitioners to claim much more in tax benefits through depreciation and investment tax credit than they would otherwise receive. Sections 1011, 1012, 167(g), 46(a)(2) and 46(c)(1); sections 1.46-3(c)(1) and 1.46-3(c)(2), Income Tax Regs. Because of these potential tax benefits to be received by Mr. Hunter and Mr. Waronker, they were willing to make payments to Southern Star that otherwise they would not have made, thereby increasing Southern Star's income. However, Mr. Hunter and Mr. Waronker were not in fact paying the stated price because of the nonrecourse nature of their notes and the contingent manner in which payment was arranged. All payments on the notes, other than interest *663 for two years, were to be made solely out of the net proceeds realized from sales of cattle. This situation is far different from one where fixed and regular payments are required to be made on the notes. [18] On the basis of this record, we conclude that the nonrecourse note was without substance. *664 This record shows that Southern Star retained control of the cattle. The cattle were to be registered in the name of Southern Star. The record does not show that the registration records indicated that Southern Star was holding the cattle for the benefit of Mr. Hunter and Mr. Waronker. Southern Star could sell cattle without the consent of Mr. Hunter and Mr. Waronker and without even consulting them. All the proceeds of the sales of cattle were retained by Southern Star. The sales agreement and management contract involved in the instant case are very similar, and in many respects identical, to the sales agreements and management contracts analyzed in Grodt and McKay Realty, Inc. v. Commissioner, 77 T.C.     (Dec. 7, 1981). In that case we concluded that there was no sale of cattle by the cattle company to the taxpayers. That case is not factually distinguishable from the instant case. The record in this case is clear that the stated purchase price of the cattle is unlikely to ever be paid. If the ten cattle assigned to Mr. Hunter each produced a calf each year that sold for a net amount of $ 500, the total receipts would be $ 5,000 a year. Of this $ 5,000, the amount *665 of $ 2,500 would go to Southern Star as management fees and $ 1,000 would go to Southern Star as an interest payment. The remaining $ 1,500 would be used to pay on the $ 66,000 note. At this rate of payment, it would require 44 years for the note to be paid off and since the $ 1,000 payment would not pay all the yearly accrued interest on the note for the first 29 years some unpaid interest would still be due at the end of the 44 years. From the evidence in this record the indication is that it is most unlikely that the offspring from the cattle assigned to Mr. Hunter would result in net sales (gross sales price less commissions, sales costs and brokerage fees) of $ 5,000 a year. The record indicates that the sales expense of cattle could run as high as 30 percent of the gross sales price. In fact, as of June 30, 1980, even after Southern Star had credited Mr. Hunter's note with $ 12,400 of cattle it "bought back" from him so he could "show a profit", there still remained $ 49,722.72 unpaid on the note. In other words, less than $ 4,000 had been credited on the note from sales by Southern Star of cattle assigned to Mr. Hunter over a period of 7 years. Mr. Waronker's note showed *666 a balance of $ 28,204.88 on June 30, 1980, even after a credit of $ 6,200 for a "bought back" cow. From the record, it appears that it would take as long or longer for "his cattle" to be paid for than for Mr. Hunter's to be paid for. We therefore conclude, based on our analysis set forth above, as well as the analysis set forth in the Grodt and McKay case, that the transactions between Southern Star and Mr. Hunter and Mr. Waronker in 1973 did not constitute a sale of cattle by Southern Star to Mr. Hunter and Mr. Waronker. Mr. Hunter and Mr. Waronker each argues that the fact that he actually paid out-of-pocket sizable amounts as a management fee to Southern Star for the care and maintenance of the animals indicates that he did own the cattle. The characterization of the amounts paid for maintenance is merely an exercise in labeling. Southern Star was well paid for arranging an attractive package of tax benefits for petitioners. From 1973 to 1975, Southern Star received $ 40,956 and $ 19,620 in actual cash payments, respectively, from Mr. Hunter and Mr. Waronker. On the basis of this record, we conclude that Mr. Hunter and Mr. Waronker each willingly made these payments solely *667 for the tax benefits he might receive from the deal. [19] See Tables A and B, supra. Within a very few years Mr. Hunter and Mr. Waronker each received tax benefits well in excess of his total cash expenditure and would continue to retain such benefits for an extended period of time. Here, as in Knetsch v. United States,364 U.S. at 363, what each petitioner paid cash for was hoped-for tax deductions. The entire transaction was a sham entered into solely to obtain tax benefits. *668 On brief, petitioners argue that in the event the Court finds the stated purchase prices not to be within a reasonable range of the fair market value of the animals, Mr. Hunter and Mr. Waronker are still entitled to their claimed deductions and investment credit for the reason that they had simply made bad bargains. The record does not support this contention. We recognize that a finding that a transaction lacks economic substance is not one which should lightly be made. We are aware of the statement of the Ninth Circuit Court of Appeals in sustaining our decision in Estate of Franklin (544 F.2d at 1049) that-- Our focus on the relationship of the fair market value of the property to the unpaid purchase price should not be read as premised upon the belief that a sale is not a sale if the purchaser pays too much. Bad bargains from the buyer's point of view--as well as sensible bargains from the seller's point of view--do not thereby cease to be sales. * * * We intend our holding and explanation thereof to be understood as limited to transactions substantially similar to that now before us. It is unlikely (though it is possible) that where the stated purchase *669 price of property is many times its actual value there was simply a bad buy. In any event, the evidence in this case is overwhelming that Mr. Hunter and Mr. Waronker each entered into his transaction with his eyes open. Both Mr. Hunter and Mr. Waronker are sophisticated individuals with a wealth of education, training and practical business experience. The reasonable inference from the record is that each of them knew that the payments he made were solely to obtain deductions in computing his Federal income tax. The record clearly indicates that Mr. Hunter and Mr. Waronker were not purchasing cattle or securing maintenance for such animals but were purely and simply purchasing a package of potential tax benefits. Because the arrangement was so well structured to this end, these benefits would continue for many years, even though Mr. Hunter and Mr. Waronker each had recouped more than the cash he paid for the program during the years here in issue through claimed deductions. On the facts presented here, we conclude neither Mr. Hunter nor Mr. Waronker is entitled to deduct the amounts he claimed as depreciation, interest expense (including the interest expense which respondent *670 claims to be nondeductible in his answer to Mr. Hunter's petition) or maintenance fees since he made no purchase of cattle. Grodt and McKay Realty Inc. v. Commissioner,supra.See also Estate of Franklin v. Commissioner,544 F.2d at 1048. Since no sale of cattle was in substance made to Mr. Waronker and Mr. Hunter, the nonrecourse note was not a valid indebtedness interest on which is deductible. Estate of Franklin v. Commissioner,supra.Also, since Mr. Hunter and Mr. Waronker had not purchased cattle, neither of them is entitled to an investment credit with respect to the cattle assigned to him by Southern Star. The facts in this case show that Mr. Hunter and Mr. Waronker each ostensibly made small downpayments, $ 6,000 by Mr. Hunter and $ 1,000 by Mr. Waronker. Each also made respective cash payments of $ 26,000 and $ 13,000, which were donominated as maintenance. However, in our view, as stated above, the $ 40,956 and $ 19,620 in cash paid by petitioners simply represented the fees required for entry into an elaborate tax avoidance scheme which was devoid of any economic substance. We are thus not bound, nor do we attach any significance *671 to the labels the parties affixed to the cash payments. Helvering v. F. & R. Lazarus & Co.,308 U.S. 252 (1939); Hamme v. Commissioner,209 F.2d 29, 32 (4th Cir. 1953); Grodt and McKay Realty Ins. v. Commissioner, 77 T.C.     (Dec. 7, 1981). In reaching the conclusion that the payments by Mr. Waronker and Mr. Hunter were solely to obtain tax deductions over an extended period of time, we have considered the testimony in the record that occasionally a "prize bull" or "prize cow" will be produced from a herd and bring a very high price. Such a "prize" being produced from any herd is extremely unlikely, and with the provisions of the contracts here involved we consider the production of such a "prize" to be so remote that no part of the payments made by Mr. Hunter and Mr. Waronker was for such contingency. Petitioners' expert witness testified that it required many years to develop a prize cow. It required showing the cow as well as several of its offspring to establish that not only did the cow have superior qualities but that it was able to pass those qualities on to its progeny. There is no indication in the record that Southern Star *672 was attempting to handle any of the cattle assigned to Mr. Hunter and Mr. Waronker in this manner. Since Southern Star raised cattle for its own account, it is most unlikely that it would go through the long process necessary to establish a prize cow with any of the cattle assigned to Mr. Hunter or Mr. Waronker. The success rate in producing a prize cow, even after the expenditure of great effort over a period of years, is very low. Since male calves produced by the cows assigned to Mr. Hunter and Mr. Waronker were sold at the age of 24 months or less, the likelihood of a prize bull being produced from the cattle assigned to either of them was nil. In light of our holding above, we do not reach the question of whether section 183 would disallow the depreciation and maintenance deductions taken by each Mr. Hunter and Mr. Waronker, nor whether section 465 might limit the deductions taken by Mr. Hunter in 1976. However, since we have concluded that Mr. Hunter and Mr. Waronker did not own the cattle assigned to them by Southern Star, neither of them was required to report any portion of the "sales price" of the cattle sold by Southern Sales which were assigned to them. The reported *673 income of each Mr. Hunter and Mr. Waronker should be reduced by the amount he reported as income from cattle sales. The total proceeds from such sales were retained by Southern Star and were in fact, to the extent the proceeds represented gain on the sale of the cattle, the income of Southern Star. Obviously, the fact that we have held the entire transaction to be a sham for Federal tax purposes does not necessarily change the other rights of the parties under their agreements. If at some date in the distant future any actual money is received by either Mr. Waronker or Mr. Hunter under the agreements, the tax effects of such receipt will have to be determined as of that year. We in no way in this case pass on the rights of the parties under the agreements, other than for Federal tax purposes, or what the Federal tax effects would be if either petitioner at some future date did actually receive some of the proceeds on the sale of the cattle. The remaining issue is whether the amounts paid by Mr. Hunter as minimum tax in 1975 and 1976 are deductible because the minimum tax is an excise tax, not an income tax. This Court has expressly held that *674 the minimum tax is a Federal income tax, the payment of which is not deductible under section 275. Graff v. Commissioner,74 T.C. 743 (1980); Standard Oil Co. (Indiana) v. Commissioner,77 T.C. 349, 411-412 (1981). On the basis of these cases, we hold that the amounts of minimum tax paid by Mr. Hunter in 1975 and 1976 are not deductible. Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. The use of the name Southern Star in this opinion encompasses not only Southern Star Land and Cattle Company, Inc., but also its wholly owned subsidiary, Cattle Management, Inc.↩
3. At a later date Southern Star decided to devote its operations exclusively to the Black Angus breed and, without consulting Mr. Waronker, substituted animals of that breed for the exotic animals previously assigned to Mr. waronker.↩
4. Although this warranty is provided for in the sales contract, it was related to the subsequently discussed management contract.↩
5. These warranties also were contained in the sales agreement in substantially the same language.↩
6. The following is a summary of the payments required by each Mr. Hunter and Mr. Waronker under the respective sales and management contracts: Hunter
Waronker
Downpayment on purchase price
$ 6,000
$ 1,000
Initial interest payments through 12/1/75
(assuming no payments were made on
principal of the note)
8,956
5,620
Initial pasture & Maintenance fee payments
through 12/31/75
26,000
13,000
$ 40,956
$ 19,620
All other payments of principal and interest on each note and for maintenance and pasture rental were to be made out of the net proceeds derived from the sale of cattle. Until the purchase money nonrecourse note was paid in full, Southern Star retained 100 percent of the net proceeds from the sale of cattle referred to in the sales contract as the cattle of Mr. Hunter and Mr. Waronker. Thirty percent of such proceeds were applied to the note, 20 percent to interest, and 50 percent to management fees. Only when the notes were fully paid would each petitioner be entitled to receive a percentage of any further net proceeds.↩
7. Mr. Waronker testified that a similar type of document was given to him in 1973. Mr. Waronker stated that the 1973 offering memorandum had a similar section dealing with the minimum requirements for an investor and that in the information pertaining to tax aspects the 1973 offering memorandum contained a projected schedule of deductions which a hypothetical investor in the 50 percent tax bracket would receive over the years. Mr. Hunter testified that he could not remember whether or not he had seen such a document. However, Mr. Hunter stated that such a document might have been furnished to his brother-in-law. Each of the sales contracts and management contracts signed by Mr. Hunter and Mr. Waronker contain the following provisions: Buyer is fully aware of the speculative nature of purchasing and managing breeding cattle and represents that his financial circumstances are consistent with this investment and that he is a sophisticated investor and by reason of his business and financial experience, he has the capacity to protect his own interests in connection with his investment.↩
8. In this respect Mr. Hunter testified-- I am also not -- I haven't memorized the contract. But my perception at the time that I did review it, at the time that this took place, was that the company was within its rights buying the cattle from me whether I assented or not.↩
*. This $ 11,144 is assumed to be from the transaction here in issue even though in 1977 Mr. Hunter was engaged in a farming operation with his brother-in-law, Mr. Fisher, under the name "Cook's Hope Farm" which he testified included a breeding cattle operation. See fn. 12, infra↩.
9. This $ 29 was described on Form 4797 as follows: "Breeding Cattle culls - $ 29." ↩
10. The $ 30,628 as computed on Schedule F represented the claimed deduction from the transaction with Southern Star involved in this case.↩
11. This computation was shown in detail on the return, but the details, other than as here stated, are not of consequence in this case.↩
12. This amount is not broken down between sales in connection with the transaction here in issue and sales in connection with Mr. Hunter's Cook's Hope Farm. Mr. Hunter testified that in 1977 he had a breeding cattle operation at Cook's Hope Farm. The 1977 return does not expressly state that no portion of the $ 11,144 came from sales of cattle at Cook's Hope Farm. However, the record does show that under date of June 21, 1977, Mr. Hunter received a letter from Southern Star identical to the one he received dated December 1, 1976, and attached thereto was the statement: I agree to sell the following animals to Southern Star Land & Cattle Co., Inc. I understand that Southern Star has waived its Management and Interest rights and will apply all the proceeds to reduce my mortgage. Ear Tag
Date of
Number
Birth
Amount
63036
12/28/75
$ 3,100
T960
11/7/75
3,100
At the bottom of this attachment to the June 21, 1977, letter is Mr. Hunter's signature dated July 1, 1977. Therefore, at least $ 6,200 of this amount was clearly with respect to the transaction here in issue. We assume that the balance was also with respect to the transaction here in issue since no Schedule F for Cook's Hope Farm was attached to Mr. Hunter's 1976 return and apparently that operation was in its first year in 1977. Also, in his petition Mr. Hunter alleged that in 1977 his gross income derived from the transaction here in issue exceeded the deductions attributable thereto. Further, attributing the entire amount as being with respect to the subject transaction would be consistent with the fact that Mr. Hunter also claimed a $ 2,472 deduction for maintenance and pasture rental with respect to the transaction in 1977. ((11.144 - 6,200) X 50% equals $ 2,472.) As to the two animals referred to above, the cow records of Southern Star show that later Southern Star on January 24, 1979, resold one animal to a third party for $ 522.50 and on February 17, 1980, sold the other to a third party for $ 919.↩
13. Apparently in this respect Mr. Levine was referring to the provision of the sales agreement permitting a buyer in 1973 to take possession of his cows for this amount per cow.↩
14. In a prospectus dated June 10, 1975, which was filed with the Securities and Exchange Commission by Southern Star, the company acknowledges that "The cost to Herd Owners of cattle offered hereby is substantially in excess of the cost of such cattle to [Southern Star], exclusive of its costs of warranties." In the same prospectus it is later stated that the estimated warranty cost per animal is $ 2,040. In 1975 the price per animal of the offering described in the prospectus was $ 8,000. The record indicates that no such prospectus was issued in 1973. The June 10, 1975, prospectus states that on May 14, 1975, a consent agreement was reached between Southern Star and the Securities and Exchange Commission. None of the 1973 promotional materials gives a breakdown of the stated purchase price of $ 7,200 per cow. ↩
15. The claimed cost of $ 2,040 per animal for the warranties in the prospectus referred to in footnote 14 is excessive. Petitioners' expert witness testified that an average yearly crop rate of 80 to 85 percent is an expected standard in the industry. He even remarked that with a really well-operated purebred breeding herd a calf crop rate of 85 to 90 percent might be possible. He volunteered the statement that if a breeder was not overly concerned with carefully breeding specific cows to certain bulls and with having animals bred by certain dates for show classification purposes, such percentages should even be better. Since Southern Star was only obligated under the warranties to replace with an animal of equal quality, the cost to Southern Star would have been minimal for cows dying before reaching their tenth birthday considering the mortality rate for cows shown by the record and the original cost to Southern Star of the animals assigned to Mr. Hunter and Mr. Waronker. The record shows that a guarantee to replace a non-breeder was common and accepted in the industry. ↩
16. Petitioners' expert, a cattleman, did not break down the $ 7,200 per cow figure by testifying as to which portions of such amount he would allocate to the component parts of the Southern Star program. Instead, he made the merely conclusional statement that, in his opinion, viewed as a total package a figure of $ 7,200 per cow was reasonable.↩
17. The events which took place in 1976, whereby Southern Star attempted to manufacture profits so as to allow each petitioner to claim the presumption provided under section 183(d), clearly demonstrates the actual nature of the transactions entered into in 1973. Southern Star knew that the animals it was ostensibly repurchasing from petitioners were worth nowhere near the stated purchase prices. The animals were shown by Southern Star's own records not to be purebreds and to have no value beyond their value as cattle for slaughter for meat. We simply do not believe the testimony of Mr. Levine that Southern Star wanted these animals because they were high quality animals, or the other reasons given by Mr. Levine for Southern Star's acquiring the animals. From this record, it is clear that all Southern Star did was reduce the principal on the nonrecourse note of each Mr. Hunter and Mr. Waronker by $ 6,200. Since the purchase prices shown in the sales contracts were so grossly overstated, and in view of the fact that payment of this price was to be made solely out of the net proceeds realized from the sale of cattle assigned to Mr. Hunter and Mr. Waronker, Southern Star did not lose anything since it never expected the notes to be paid off. Furthermore, Southern Star would have kept all funds from the sale of cattle in any event under its contract with Mr. Hunter and Mr. Waronker. The only difference was that, by applying this total amount it kept to the note, income was generated for Mr. Hunter and Mr. Waronker in an effort to comply with sec. 183(d). If this had not been done and those amounts had been applied as provided in the contract, there would be a paper loss for the year since the 20 percent applied to interest and the 50 percent applied to management fees would have been reported to Mr. Hunter and Mr. Waronker as items which were deductible in computing their Federal income tax. ↩
18. To be sure, the mere nonrecourse nature of a purchase note and the fact that its terms of payment may seem out of the ordinary does not mean that a purchase price was not arrived at by arm's length negotiation. Rather, each case turns on its own facts. See Mayerson v. Commissioner,47 T.C. 340, 352-353↩ (1966).
19. Mr. Hunter and Mr. Waronker each testified at the trial that his prime motive in entering the transaction was not the tax advantages. Mr. Waronker testified that in 1973 he was not even in the 50 percent tax bracket. However, if Mr. Waronker had not claimed $ 20,273 in deductions due to his participation in the Southern Star program, his taxable income for 1973 would have been $ 46,583.53, placing him just in the 50 percent incremental bracket.See sec. 1(a), as amended by Pub. L. 91-172, sec. 803(a), 1969-3 C.B. 10, 123. At any rate, the significant point is that if Mr. Waronker had not taken part in the Southern Star program, he would have paid, we calculate, approximately $ 15,000 in taxes for 1973 as opposed to the $ 3,820.79 which he reported. Moreover, this $ 11,179.21 is the tax savings for only the initial year of his participation in the program. Mr. Hunter testified that, because of a large $ 250,000 partnership loss which he knew his wife would have for 1973, he could not anticipate in November of that year using the deductions resulting from his participation in the Southern Star program either in 1973 or 1974. If this testimony was intended to have led us to draw the conclusion that he could not in fact use the deductions at all at that point, such conclusion would be erroneous. Mr. Hunter, on his original 1973 return, reported a loss of some $ 259,546. However, on his original 1974 return dated April 15, 1975, there is a net operating loss carryforward schedule showing that the 1973 loss gave rise to a 1973 net operating loss of $ 255,796.The schedule shows that $ 83,455 of this loss was carried back and used by Mr. Hunter in 1971, $ 104,874 of the loss was carried back and used in 1972, and the remaining balance of $ 67,467 was carried forward and taken as a deduction for 1974. Unquestionably, Mr. Hunter would have known that he could use the last portion of the 1973 net operating loss in 1974. For 1974, Mr. Hunter and his wife reported $ 118,192 in dividend income; for 1973 they reported $ 118,505 of such dividend income. We conclude that the testimony of each Mr. Hunter and Mr. Waronker, that the tax benefits were not his primary motive for entering into the transaction with Southern Star, is not credible. In fact, based on the record in this case we conclude that the tax benefit to be obtained was the only motive of each of them for entering into the transaction.↩