DAVID A. SIEGEL and BETTIE I. SIEGEL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Siegel v. Commissioner
Docket No. 14907-80.
United States Tax Court
T.C. Memo 1985-441; 1985 Tax Ct. Memo LEXIS 187; 50 T.C.M. (CCH) 880; T.C.M. (RIA) 85441; August 22, 1985. *187 Held: Petitioners' transactions with Southern Star Land & Cattle Company, Inc., were not bona fide sales. Thus, petitioners are not entitled to deductions for depreciation, interest, or maintenance fees relating to their purported cattle purchases. Hunter v. Commissioner,T.C. Memo. 1982-126. Paul H. Freeman, for the petitioners. [1]
Avery Cousins III, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT *188 AND OPINION WHITAKER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
1972
$15,768
1973
5,332
1974
2,898
1975
841
1976
3,898
The issues for decision are: (1) Whether the statutory notice of deficiency encompasses the theories or issues, on which Hunter v. Commissioner,T.C. Memo. 1982-126 was decided [2] and, if so, which party bears the burden of proof as to facts relevant to these theories and/or issues; and (2) whether petitioners are entitled to interest, [3] maintenance fees, and depreciation deductions claimed in connection with their purported purchases of cattle in 1971. [4]
*189 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and exhibits attached thereto are incorporated herein by reference. Petitioners resided in Orlando, Florida at the time their petition was filed. Both petitioners were real estate brokers during the years in issue.Prior to entering into agreements with the Southern Star Land & Cattle Company, Inc. ("Southern Star"), petitioners had not engaged in any cattle breeding activity. As used hereinafter, petitioner in the singular refers to David A. Siegel. In 1962, petitioners met Neal Levine, a certified public accountant, who became their accountant and personal friend. [5] In January 1970, Levine founded Southern Star, a Florida corporation engaged in breeding, raising, and selling cattle. According to Levine, his basic concept in starting Southern Star was to buy land, put cattle on it for investors, and make money by managing the cattle for said investors, which money would be used to pay for the land. One of Southern Star's three ranches was located in Citra, Florida and on his trips to that ranch, Levine visited petitioners. As a result, petitioners became interested in Southern *190 Star's operation and made a number of family trips, on which their children sometimes accompanied them, to the Citra ranch. On these trips, petitioners drove around the ranch; observed how the cattle were fed, tattooed, and artificially inseminated; and talked to the Citra ranch foreman. After 8 to 10 trips and numerous discussions with Levine, petitioners decided that they wanted to invest in cattle. Because, as they admit, they were total novices when it came to cattle, petitioners requested additional information from Levine before making any investment. [6] Initially, Levine advised petitioners that Southern Star was not the type of investment they should consider. He explained that Southern Star sought to sell cattle to people seeking depreciation and interest deductions who did not expect any positive cash flow during the years immediately succeeding investment. Levine's explanation comports with a 10-year projection of the tax benefits to be derived from an investment in Southern Star dated July 1, 1971. The projection is of an investment in 1971 consisting of a purchase of 10 cows at $2,500 per head and a one-third interest in a bull for $10,000. The projection reflects *191 the benefits for a 50-percent tax bracket investor of said investment with an anticipated liquidation of the investment in 1981.For a total investment of $21,439 (principal payment of $1,080; 6-percent estimated interest payments of $5,109; and maintenance payments of $15,250), all of which were to be made during the first 3 years, an investor could anticipate the following deductions and tax benefits: 6-Percent
Tax
Estimated Interest
Maintenance
Depreciation
Write Off
$15,808
$71,800
$35,000
$100,808
As projected, for an out-of-pocket investment of $21,439, an investor could anticipate tax savings of $50,404. The record is unclear as to whether this projection is the one received by petitioners at or near the time of their cattle investments. The projected investment is, however, identical to the two made by petitioner in 1971 and liquidated in 1981. *192 In considering an investment with Southern Star, petitioners made no inquiry of Levine or Southern Star personnel concerning Southern Star's costs for the cattle they anticipated purchasing. Levine had purchased said cattle in 1970 at an average price of $500 per head. At the time petitioners made their cattle investments with Southern Star, the average sale prices of purebred Aberdeen Angus cattle were $650 for a bull and $465 for a female. [7]
Despite Levine's advice that, since petitioners had just begun making money, they should consider other forms of investment, on July 8, 1971, petitioner entered into two agreements with Southern Star for the purchase of purebred Aberdeen Angus cattle. The basic instruments embodying each of petitioners' agreements *193 with Southern Star include a sales agreement, a management agreement, a promissory note, and a security agreement. [8] The sales and management agreements provide that said agreements constitute the entire understanding between the parties and cannot be amended or terminated orally. Both of these agreements also recite that petitioner is: fully aware of the speculative nature of purchasing and managing breeding cattle and represents that his financial circumstances are consistent with this investment and that he is a sophisticated investor and by reason of his business and financial experience, he has the capacity to protect his own interests in connection with his investment. [9]
The two sales agreements executed by petitioner *194 are identical, each providing for the "purchase" of a "basic herd" comprised of 10 purebred Aberdeen Angus females for $25,000 (i.e., $2,500 per head) and a one-third interest in a purebred Aberdeen Angus bull for $10,000 (i.e., total price for bull would be $30,000). [10] Each agreement provided that the purchase price of $35,000 would be paid by a down payment of $1,080 plus approximately 5-months interest at 6 percent per annum with the balance to be paid, at the option of the purchaser, in cash or by execution of a nonrecourse note secured by the cattle. In 1971, petitioner made the initial down payment of principal and interest which payments totaled $2,320. On December 29, 1971, petitioner executed two promissory notes in the amount of $33,920 each. These notes provided for cash payment of interest, at the rate of 6 percent per annum, for 2 years (1972 and 1973). Beginning in January 1974, all interest was to be paid from proceeds of sales of petitioners' cattle (20 percent of net sale proceeds was to be so applied). [11] With the exception of the initial principal down payment of $2,160, all principal was to be paid from proceeds of sales of petitioners' cattle (30 percent *195 of net sale proceeds was to be applied toward reduction of principal). [12] The promissory notes provided that petitioner had "no personal liability of any kind whatsoever" under the notes, and "no personal liability for any deficiency." Petitioners' cattle was the sole collateral for the promissory notes. The sales agreements represent and warrant all animals in petitioners' basic herd to be breeders capable of being registered with the American Angus Association. Registration of the cattle was to remain in Southern *196 Star's name. Southern Star agreed to replace any nonbreeders in the basic herd. [13] Written or implied nonbreeder warranties are relatively standard in the purebred cattle breeding industry. Under the two management agreements which petitioner entered into simultaneously with the sales agreements, Southern Star agreed to "breed, care for, maintain, feed, transport, and provide whatever is necessary, including, without limitation, medical services and facilities to the Basic Herd and all progeny issuing therefrom * * *." Southern Star's management fee for each of the herds was $3,750 for the period July through December 1971, $7,500 for the year 1972, and $4,000 for the year 1973. In addition to the amounts paid by petitioners as management fees in 1971 through 1973, Southern Star was entitled to retain 50 percent of all net proceeds from sales as management fees. After 1973, all maintenance fees were to be paid from 50 percent of the net proceeds of cattle sales. *197 Each management agreement provided that Southern Star would: (1) Cull the herd periodically; [14] (2) retain for breeding purposes at least one bull calf born to the herd which had been sired by Southern Star's prize bull; and (3) if the breeding bull in which petitioner had a one-third interest died, became sterile, or was sold, substitute a similar interest in a breeding bull of equal stature and value. The management agreements provided that Southern Star would, wherever possible, use artificial insemination from "the best breeding bull in the Herd" at no additional cost to the owner and would endeavor to breed all cows and heifers as they came into season. [15] This provision was of no particular value as Southern Star was not required to use artificial insemination. Also, the costs of artificial insemination may be equal or lower than impregnation through natural service. Southern Star further agreed to replace any animal in the breeding herd which died prior to its tenth birthday from any cause. [16] Mortality rates of breeding age heifers is small. *198 Under the management agreements, each of petitioners' herds would increase in size from 10 to 15 animals by July 1, 1976. Thereafter the herds would be maintained at this level for the duration of the term of the management agreements. Southern Star agreed that, commencing with the calendar year 1972, if the annual live calf birth rate was less than 80 percent and such deficiency was not offset by calves born in the immediately preceding calendar year, Southern Star would transfer to the petitioners' herd a sufficient number of animals to make up any net deficiency. An 80 percent calf drop is normally expected in the purebred cattle business. So long as the management agreements remained in effect and the promissory notes remained outstanding, Southern Star was granted "full control of the location, maintenance, expansion, breeding, and culling" of the herds. Southern Star was empowered to sell animals without petitioners' consent if payment was to be received in less than 15 months of the sale. If payment was not to be received in less than 15 months, consent of petitioner was required but such consent could not be unreasonably withheld. The management agreements provided *199 that either party could liquidate each of the herds by giving written notice at any time the unpaid principal balance due on the relevant promissory note had been reduced to $12,000 or less. Additionally, Southern Star could cause the liquidation of each herd at any time after the unpaid principal balance on the relevant note had been reduced to $20,000 provided it guaranteed petitioner that the net proceeds of such liquidation would at least equal three times the then remaining principal balance of the note. [17] Petitioner had the right to terminate the management agreements and remove the herds from Southern Star's care, possession, and control if Southern Star filed a voluntary petition in bankruptcy, made an assignment for the benefit of creditors, or voluntarily submitted to any procedure for receivership, liquidation, or reorganization, or was the subject of an involuntary petition of bankruptcy. If Southern Star defaulted under the management agreements and petitioner terminated said agreements, payment of the outstanding principal and interest due on the promissory notes was required. *200 The management agreements provided that Southern Star would maintain and keep books and records concerning the herds which would be available for inspection. In purebred cattle breeding, the maintenance of careful records on each cow is very important. [18] Fees for maintaining books and records were included in the management fees. Southern Star was required to transmit to petitioner annual reports concerning sales and annual reports covering the location and development of petitioners' herds. [19] Each year Southern Star provided sample tax forms detailing the recommended Federal tax reporting of petitioners' cattle investments. Petitioners' generally followed these recommendations. *201 Petitioners never saw the cattle they purportedly purchased. [20] Said cattle were selected by Southern Star. [21] Petitioners did not consider it necessary to see their cattle since they felt they were purchasing a ready-made, turnkey breeding operation where Southern Star was going to do everything. Petitioners out-of-pocket payments to Southern Star for their cattle investments were as follows: 1971
1972
1973
[22] Total Principal
$2,160
$0
$0
$2,160
Interest
160
$5,988
4,070
10,218
Maintenance
7,500
15,000
8,000
30,500
*202 When, in 1972 and 1973, petitioners were tardy in making cash payments under the agreements, they received letters from Southern Star reminding them to make such payments immediately so they would get their projected tax write-offs. During the years in issue, petitioners claimed the following deductions, totaling $84,785.00, for their Southern Star cattle investments: 1972
1973
1974
1975
1976
[23] Depreciation $18,875
$11,520
$5,093
$2,074
$1,449
Interest
5,988
4,070
963
214
974
Maintenance
19,813
8,375
2,407
535
2,435
Total Deductions
$44,676
$23,965
$8,463
$2,823
$4,858
In 1972 and 1973, petitioners reported income from sales of cattle culled from their herds of $627 and $750.92, respectively. They were entitled to receive 20 percent of these amounts, i.e., $125.40 in 1972 and $150.18 in 1973. It is unclear on this record whether or not petitioners were actually paid these amounts. Until the promissory notes were paid in full, petitioners were not *203 entitled to receive any of the proceeds from sale of their cattle after 1973. Fifty percent of such proceeds went to payment of management fees, 20 percent to interest (current and accumulated) and 30 percent to reduction of note principal. In 1974, petitioners reported income from cattle sales of $10,121. This amount included purchases by Southern Star [24] of three cows and a calf for approximately $3,200 [25] and the repurchase of the two one-third interests in breeding bulls for $12,500. [26] At the time of Southern Star's 1974 purchases, the average sales prices of purebred Angus cattle were, for females, $520 per head and, for bulls, $635 per head. In 1975, petitioners reported income from cattle sales of $3,070 of which approximately $2,000 represented purchases of two cows by Southern Star. [27] At the time of these purchases, the average sale price of purebred Angus females was $537 per head. In 1976, petitioners reported income from cattle sales in the amount of $6,192 of which approximately $2,078 represents repurchase of two cows by Southern Star. [28] At the time of these repurchases, the average sales price for purebred Angus females was $542. All gain reported by petitioners *204 from their cattle investments was the result of Southern Star's cattle purchases. *205 Petitioners continued to report sales of cattle and claim deductions from their Southern Star investments in 1977, 1978, and 1979. [29] Beginning with their 1980 Federal income tax returns, petitioners ceased reporting income or claiming deductions for these investments. In 1981, Southern Star discontinued its cattle businesses and petitioners' herds were liquidated. Southern Star's accounting to petitioners of the liquidation proceeds [30] credited petitioners with three times the outstanding principal on their promissory notes and deducted the following amounts due Southern Star: [31]
Note Balance
$ 42,401.07
Interest
15,812.71
50 percent maintenance fees
53,601.61
Total Deductions
$121,817.39
Total due petitioners
$ 5,387.82
Petitioners never received any part of the amount purportedly due them on liquidation of their herds. *206 Respondent disallowed all deductions claimed by petitioners for their cattle investments with Southern Star for the years 1972 through 1976. The primary bases cited for this disallowance were that petitioners were not engaged in the trade or business of farming but were either investors in a security issued by Southern Star or creditors of Southern Star, or alternatively, were not engaged in farming for profit. Rather than gain from the sale of property, respondent recharacterized income from Southern Star's repurchase of cattle as income from forgiveness of indebtedness and income from other cattle sales as dividends paid petitioners by Southern Star. OPINION As a threshold issue, petitioners assert that the statutory notice of deficiency did not encompass the sham [32] theory and, given respondent's declination to amend his answer, this theory is not within the jurisdiction of the Court. Petitioner further argues that, if the underlying theory of the Hunter decision is before the Court, respondent bears the burden of proof as to all facts relevant to this theory. Respondent disagrees, asserting that the notice of deficiency was broad enough to encompass all issues, and *207 theories decided in Hunter and that no "new matter" arose during trial. Alternatively, respondent argues that, if construed as a "new matter," the sham theory was tried by consent of the parties and can now be decided by the Court. Elaborating on this argument respondent asserts that the sham theory is inherent in the security interest and option to purchase cattle theories advanced in the statutory notice of deficiency. If held not to be within the notice of deficiency, respondent asserts that certain factual issues, such as petitioners' profit motive in investing with Southern Star and the fair market value of the cattle purportedly purchased, are aspects of the specific challenges contained in the statutory notice of deficiency. As to these issues, therefore, respondent asserts that no shifting of the burden of proof would occur even if the Court were to hold that a "new matter" was raised during trial. [33] Respondent further contends that, if any burden of proof has shifted, said burden has been met. *208 During trial, the Court advised the parties that the theory underlying the Hunter decision was implicit in the case and that petitioner would not have grounds to object to addressing it in this proceeding. The fact that respondent declined to amend his answer to explicitly encompass the theory is not determinative. Pursuant to Rule 41(b)(1), [34] we hold that the issue of the applicability of the theory underlying the Hunter decision was tried by consent of the parties. Having determined that the analysis used in Hunter is applicable does not resolve the question *209 of which party bears the burden of proof as to this issue. Many of the factual determinations inherent in our consideration of the economic substance of the alleged transactions would also control in considering theories clearly within the ambit of the statutory notice of deficiency. Theoretically each party would bear the burden of proof on a given factual matter depending on the theory under consideration. We need not, however, resolve this esoteric question. Our decision in this case does not rest on a failure of either party to carry its burden of proof. Respondent presented sufficient evidence to prove that petitioners' purported cattle purchases were totally lacking in economic substance. The factual pattern in this case is substantially similar to that in Hunter v. Commissioner,T.C. Memo. 1982-126, 51 P-H Memo T.C. par. 82-126, 43 T.C.M. 764 (1982) which case respondent argues is controlling. In contrast, petitioners assert that the only fact identical in Hunter and the instant case is that cattle were purchased from and managed by Southern Star. [35] We disagree. The aspects in which the facts of this case differ are not sufficiently significant *210 to warrant a decision contrary to Hunter.
The crux of the Hunter decision, and basis of our decision in this case, is the determination that the purported sale of cattle was so lacking in economic substance as to preclude being treated as such for tax purposes. As noted in Hunter, numerous factors must be considered in reaching this determination, the most significant, in this case, being: (1) Whether the stated price for the cattle is within the reasonable range of their value; [36]
(2) whether there was any intent that the purchase price would ever be paid; (3) whether petitioners had any control over the cattle purportedly purchased and, if so, the extent of that control; and (4) whether petitioners did or would receive any benefit from the disposition of the cattle. Whether the transactions in issue are, in economic substance, sales for Federal tax purposes is made as of the date of the purported cattle sales. *211 However, petitioners' and Southern Star's subsequent actions may be considered to the extent they cast light on their intentions at the time of the purported sales. Hunter, 43 T.C.M. at 777, 51 P-H Memo T.C. at 524-82. Petitioner's argue that the most significant difference between the instant case and Hunter is that in Hunter cows were purportedly purchased for $7,200 per head, almost three times petitioners' stated purchase price. It is not, however, *212 the stated purchase price itself which is significant but rather the relationship of that price to the value of the cattle. Houchins v. Commissioner,79 T.C. 570, 598 (1982). Petitioners assert that in Hunter the Court found that the cows purchased had a value of $1,800 per head. While we disagree that this finding was made, [37] in Hunter the taxpayers' purchase price was four times this value. The disparity between purchase price and value is even more extreme in this case. Petitioners purportedly paid $2,500 per head for cows reasonably valued at $465 per head, [38] i.e., the stated purchase price was more than five times the value. For a one-third interest in a bull with a total value of $650 (1/3 = $216.66), petitioners purportedly paid $10,000, i.e., the stated purchase price was more than 46 times the value. [39] The stated purchase price for the cattle was not within the reasonable range of their value. *213 As in Hunter, petitioners argue that the value of the warranties and other services provided by Southern Star must be considered in determining the relationship of the stated price to the value of what was purchased. We disagree. Hunter, as well as other purebred cattle cases, has explicitly held that warranties to replace nonbreeders and guarantees of 80 percent calf birth rates are standard in the purebred cattle business and have minimal, if any, impact on the value of cattle purchased. Similarly, warranties concerning cattle deaths for cattle up to the age of 10 years have minimal value and said value should be attributed to the value of the management services not the value of the purchased cattle. Hunter,43 T.C.M. 778 n.15, 51 P-H Memo T.C. at 82-525; Grodt & McKay Realty Inc. v. Commissioner,79 T.C. 1221, 1223 n.6, 1239, 1240; Houchins v. Commissioner,supra at 570, 594 (regarding Simmental cattle). Petitioners assert that, unlike the situation in Hunter, there is every indication that they intended to pay the stated purchase price for the cattle. The evidence indicates otherwise. The difference *214 between value and stated purchase price was so extreme it is inconceivable petitioners would ever pay off their notes. Other than their initial down payment of $2,160 (which represents approximately 3 percent of the stated purchase price), petitioners were not required nor did they make any out-of-pocket payments to reduce the note balances. During the 10 years of their investments with Southern Star, the principal balance of their notes was reduced by $25,438.93. Most of this reduction was due to Southern Star's purchase of petitioners' cattle at greatly inflated prices and its waiver of interest and maintenance fee payments so as to apply the full amount of these purported repurchases to reduction of principal. [40] It is unlikely that the stated purchase price would ever be paid. For 1978 and 1979, the last 2 years petitioners reported income from cattle sales, an average of approximately $4,500 income per year was reported. Given that only 30 percent of net proceeds of sales of petitioners' cattle was to be applied to a reduction of principal ($4,500 X 30% = $1,350), if that rate of sales was maintained and assuming interest did not accumulate, petitioners' notes would not *215 be paid off by the year 2015 (over 30 additional years). As to their intentions in purportedly purchasing cattle, petitioners seek to distinguish Hunter on two additional bases: (1) that at some unspecified future date they intended to take possession of the cattle and conduct their own ranching operation; and (2) that they reasonably relied on the opinion of their financial advisor who, over the years, had an established proven track record. These purported distinctions are, at best, illusory. According to petitioners, they intended to begin their own ranch when the herds had increased to a size sufficient to warrant such an undertaking. However, under their agreements with Southern Star, the herds would never *216 exceed 15 head each. Therefore, we give petitioners' evidence concerning their ranching aspirations no weight. [41] Similarly, there is no evidence that petitioners relied on Levine's financial advice in investing prior to their purported cattle purchases or that Levine had a proven track record as a financial advisor. More importantly, Levine initially advised petitioners not to invest in cattle, which advice they chose to ignore. Petitioners disagree with the Court's holding in Hunter that the taxpayers in that case lacked any control over the cattle purchased. They do not, however, cite any facts in this case which warrant a contrary conclusion, nor do any exist. Southern Star retained full control over the cattle allegedly sold to petitioners which control extended to determining when and the price at which the cattle would be sold, and retaining all proceeds of said sales. This case is *217 not factually distinguishable from Hunter, and we conclude petitioners never had any control over the cattle they purportedly purchased. See also Grodt & McKay Realty, Inc. v. Commissioner,supra at 1241-1242. The final factor to consider is whether petitioners did or would receive any benefit on the disposition of their cattle. Petitioners assert that, after full payment of their notes, they would receive significant benefits from the disposition of the herds. However, as discussed supra, it is unlikely petitioners' notes would ever by paid. On the liquidation of the herds in 1981, petitioners made no inquiry as to their value, choosing instead to merely walk away from these investments. In fact, petitioners had ceased reporting these investments for Federal tax purposes on their 1980 return. As noted in Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), when the stated purchase price exceeds a demonstrably reasonable estimate of fair market value: [p]ayments on the principal of the purchase *218 price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value. Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future * * *. [544 F.2d at 1048.] Petitioners never had any equity interest in the cattle they purportedly purchased. Had Southern Star not credited them with three times the outstanding note principal on liquidation, petitioners would have received nothing, even on paper, at that time. Petitioners received no cash from Southern Star on liquidation. Here, as in Hunter, the purported purchases were "entered into solely to obtain tax benefits." [42] As stated in Grodt & McKay Realty, Inc. v. Commissioner,supra at 1243, "it strains credulity and offends logic to find that a true sale, to be recognized for tax purposes, had taken place." Therefore, we conclude that petitioners are not entitled to the amounts claimed for depreciation, interest payments, or management fees since they never purchased cattle from Southern Star. As in Hunter, we also hold that petitioners are not required to report as *219 income any portion of the sales prices of cattle sold by Southern Star.Said prices were fully retained by Southern Star and, to the extent they represent gain, are income to Southern Star. Given our holding, we need not address petitioners' arguments that they purchased cattle for the purpose of engaging in the trade or business of purebred cattle breeding for profit, [43] or that they entered into bona fide indebtedness with Southern Star. Decision will be entered under Rule 155.
Footnotes
1. Until approximately 1 month prior to trial, petitioners were represented by counsel. During trial, petitioner David A. Siegel appeared pro se. On the Court's recommendation, new counsel was retained after trial to aid petitioners in presenting their arguments on brief.↩
2. During trial and on brief reference was made to the "sham theory," the "substance-over-form theory," the theories of Hunter↩ and the issue of whether the "benefits and burdens of ownership" passed to petitioners. These various approaches overlap significantly and the various designations were used interchangeably or with little real distinction. 3. As used in this opinion, terms such as "interest," "management fees," "purchase," "petitioners' herd," "petitioners' cattle," "principal," and "down payment" should not be construed as carrying any conclusion as to the legal effect of the transactions or documents involved. ↩
4. The statutory notice of deficiency also reflects adjustments in petitioners' claimed medical expenses and sales tax deductions and in claimed investment tax credits and self-employment taxes. These adjustments are a consequence of respondent's treatment of petitioners' cattle investment adjustments and were not specifically argued by either party.↩
5. Petitioners also assert that Levine became their financial advisor. With the exception of the cattle investments in issue, the record is devoid of evidence as to any investment advice given to petitioners by Levine. ↩
6. Many of the documents on which petitioner asserts he relied in deciding to make the cattle investments are dated years after he executed sales agreements with Southern Star. Even without this infirmity, these documents do not provide the type of information a prudent investor would require in deciding to make a $70,000 investment.↩
7. Average sales prices of the American Angus Association are the only reliable record evidence of cattle sales prices or values. Therefore, all references in this opinion to average sales prices or the value of cattle refer to said American Angus Association prices. American Angus Association prices were also considered reliable in Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1233↩ (1981).
8. In Hunter v. Commissioner,T.C. Memo. 1982-126↩, the taxpayers also executed subscription agreements. Their absence in this case is insignificant. 9. The sales agreement further provides "there have been no representations or warranties, express or implied, of any nature whatsoever except as expressly set forth herein and in the Bill of Sale annexed hereto as Exhibit 3 and made a part hereof." No bill of sale was received in evidence.↩
10. The one-third interest was ostensibly to provide a "standby" breeder if heifers in petitioners' herd could not be artificially inseminated. A herd bull can generally service 20 to 30 heifers per year. ↩
11. As used by Southern Star, and in this opinion, net proceeds equal gross sales price less commissions, sales costs, and brokerage fees. The sales agreement provides that interest will be paid from "the remainder of the Buyer's share of the proceeds realized from the sale of animals" after Dec. 1, 1973, which share equaled 20 percent of net proceeds. ↩
12. Identical provisions for the payment of principal and interest were included in the promissory notes.↩
13. A nonbreeder was defined as any bull whose semen could not be properly frozen to be used in artificial insemination and any cow or heifer who did not become pregnant after six consecutive breeding attempts.↩
14. Breeding cows were to be culled from the herd before or about the time they reached 8 years of age.↩
15. Southern Star agreed with most investors during 1971 and 1972 to artificially inseminate their cows, wherever possible, with semen of their prize bull, i.e., Emulous Bob of K Pride. Emulous Bob of K Pride died January 7, 1974. Agreements to breed investors' cattle to this bull were deleted from Southern Star's contracts during the later years of its operation. ↩
16. Calves were not considered part of petitioners' breeding herds until they reached breeding age. The period from birth to breeding age is the period with the largest death rate.↩
17. Southern Star also had the option to terminate each of the management agreements if the note had been paid in full or there was a failure by petitioner to cure any default in the payments after 10 days written notice of such default. The notes provided that if petitioner defaulted on performance under the sales or management agreements, the notes were, at Southern Star's option, immediately due and payable.↩
18. The key record for American Angus Association registration purposes was cattle cards maintained on each animal. Approximately half of the cow cards relating to petitioners' herd were produced during trial. ↩
19. The record indicates that the quality of Southern Star's management and recordkeeping was not high. Cow cards kept by Southern Star were incomplete: four cows were impregnated by a neighbor's bull; in two cases cows were resold by Southern Star before they were repurchased from petitioners; and, in one instance, the same cow was ostensibly owned by petitioner and another Southern Star investor. The inadequacy of Southern Star's recordkeeping or management is not, however, a critical factor to our decision.↩
20. In 1973, petitioners' cattle were at Southern Star's ranches in Kansas and Missouri. Petitioners never visited either of these ranches. ↩
21. Southern Star's standard procedure was to select the next cattle available from its inventory for any investor. Since petitioners desired older, proven breeders, their cows were selected from an appropriate group without consideration of the individual animals. Eleven of petitioners' 20 original cows were born in 1964 (i.e., approximately 7 years old when purchased). See n.14 regarding culling cows at 8 years of age.↩
22. Petitioners' out-of-pocket payments were identical to the 10-year Southern Star projection discussed supra,↩ at pp. 4-5.
23. Petitioners used the 200 percent declining balance method of depreciation for the bull interests and the 150 percent declining balance method for the cows.↩
24. Southern Star customarily waived its rights to maintenance fees and interest payments and applied the full amount of its purchases to a reduction of principal on petitioners' promissory notes. ↩
25. Pursuant to a letter dated December 2, 1974, Southern Star offered to purchase these animals for a total of $3,200. Petitioners' return for 1974 reflects sales of breeding cattle of $2,334 and $1,800 plus sales of culled animals for $240 and $441. We cannot determine which specific individual sales constituted the Southern Star purchases. The record also indicates that on the same day it purchased two of petitioners' cows for $900 per head, it resold said cows to another Southern Star investor for $8,000 per head. ↩
26. In accord with Southern Star's recommendation, $5,306 of this amount was reported as gain. As a reason for these repurchases, Southern Star advised petitioners that bulls are "no longer necessary for [Southern Star's] breeding program." ↩
27. By letter dated December 1, 1975, Southern Star offered to purchase two cows from petitioners' herds for $1,000 per head. Again, petitioners' return for 1975 reflects sales of breeding cattle for $1,000 and $1,212. No explanation of this price inconsistency appears in the record. ↩
28. By letter dated December 15, 1976, Southern Star offered to repurchase these cows for $3,400. No explanation of this price inconsistency appears in the record.↩
29. Petitioner reported income from sales of seven cattle in 1977 for $1,166 (an average price of $166.57 per head); in 1978, sales of 22 head for $4,755 (an average price of $216.14 per head); and, in 1979, sales of 13 head for $4,441 (an average price of $341.61 per head).↩
30. The record does not reflect the prices actually received by Southern Star for petitioners' cattle. The proceeds credited to petitioners were fictional. ↩
31. Since the outstanding balance on each note had not been reduced to $20,000, Southern Star was not required to guarantee petitioners three times the outstanding note balances on liquidation. This appears to be another example of Southern Star's creative bookkeeping to ensure petitioners did not remain indebted to Southern Star.↩
32. The term "sham" may be used to describe a fictitious or fabricated transaction, see, e.g., Forseth v. Commissioner,85 T.C. No. 5 (July 16, 1985) and Julien v. Commissioner,82 T.C. 492 (1984), as well as a transaction so lacking in economic substance as not to be recognized for tax purposes. See, e.g., Knetsch v. United States,364 U.S. 361 (1960); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981); and Hunter v. Commissioner,T.C. Memo 1982-126↩. It is not entirely clear that Southern Star ever intended to or did segregate any cows into the two herds which petitioners purported to purchase, or that it did any more than fabricate extensive documentation to support the alleged transactions. However, respondent has not treated this case as being a factual sham. Hence, we grant petitioners the benefit of the doubt and decide the case on the economic substance theory. 33. However, during trial respondent's counsel stated he "was comfortable" with the security interest theory explicitly set forth in the notice of deficiency and that if he argued the substance-over-form theory on brief, he would accept the burden of proof on this theory.↩
34. Rule 41(b)(1) states: Issues Tried by Consent: When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. The Court, upon motion of any party at any time, may allow such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues; but failure to amend does not affect the result of the trial of these issues.↩ (Emphasis added.)
35. Contrary to petitioners' assertion, we are not persuaded that the existence of a "cash discount" purchase price of $1,800 in Hunter,↩ and the absence of one in the instant case, creates a sufficient factual distinction between the cases.
36. Subsumed within this factor is a determination of whether the nonrecourse notes executed by petitioner have economic substance. If the relationship between the stated purchase price and the fair market value of the property acquired with the note is not within a reasonable range, the nonrecourse note lacks economic substance. Hunter v. Commissioner,43 T.C.M. 764, 777, 51 P-H Memo T.C. par. 82-126 at 524-82; Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975). Consistent with Hunter,↩ and for the reasons discussed therein, we conclude that petitioner's nonrecourse notes were without economic substance.
37. In Hunter the Court did not find a specific dollar value. The Court held, however, that "the conclusion that the stated sales prices of $7,200 per cow was many times the animals' actual value is inescapable." Hunter,43 T.C.M. at 778, 51 P-H Memo T.C. at 525-82. Additionally, the Court held that the taxpayers' estimates that auction prices of good quality purebred breeding cows at the time of their purchases (1973) were between $800 to $1,200 and $500 to $1,000 were high. Hunter,43 T.C.M. at 777-778↩, 51 P-H Memo T.C. at 524-82. Purebred Angus cattle values were lower in 1971 when petitioners' purported purchases were made. 38. We hold that the average sales prices of the American Angus Association during the comparable time period accurately reflect the fair market value of the cattle. Nothing in the record indicates said cattle were of other than average quality and the fact that petitioners took no part in selecting the cattle from Southern Star's cattle inventory supports a finding of average quality. ↩
39. A report dated December 6, 1978, prepared by one of respondent's expert witnesses indicates that, in 1978, herd bulls generally cost about $2,000 whereas the average sales price of bulls in 1978 was approximately $1,388. This equals a 44 percent premium for a herd bull. Applying the same premium to 1971 prices, petitioners purportedly paid $10,000 for a one-third bull interest with a value of $312, i.e., the stated purchase price was 32 times the value.↩
40. Southern Star's purchase of petitioners' cattle in 1974 through 1976 were at prices approximately 2 to 3 times their value; the repurchase of petitioners' one-third bull interests were at prices almost 30 times their value. The $12,500 Southern Star purportedly paid for petitioners' bull interests was applied entirely to reduction of note principal and accounts for nearly half of the principal reduction achieved over the 10-year period of the investments.↩
41. Petitioners' evidence that they investigated the purchase of two ranches on which to conduct their own cattle operation was not persuasive. These investigations were more consistent with their real estate activities than any intent to begin, or interest in, cattle ranching.↩
42. The fact that petitioners' income in the year of the purported purchases and thereafter did not allow them to fully realize said tax benefits is irrelevant.↩
43. Had we reached this argument, on the record before us we would be compelled to hold against petitioners. We further note that petitioners' assertion that they met the "for profit" presumption of section 183(d) is contrived. Any profits were illusory as they were created by Southern Star's purchases of petitioners' cattle at greatly inflated prices.↩